# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **POLYFLOW, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | Civil Action No. 4:15-cv-2817 |
| | § | **JURY DEMAND** |
| **SPECIALTY RTP, LLC AND JOHN** | § | |
| **R. WRIGHT, JR.** | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS' FIRST AMENDED COUNTERCLAIM AGAINST PLAINTIFF POLYFLOW, LLC AND JIM MOORE

**TO THE HONORABLE UNITED STATES MAGISTRATE JUDGE**:

    **COME NOW SPECIALTY RTP, LLC** ("Specialty RTP") and **JOHN R. WRIGHT, JR.** ("Wright") (collectively, "Counter-Plaintiffs")**,** Defendants/Counter-Plaintiffs in the above-entitled and numbered cause, who file this their First Amended Counterclaim against **POLYFLOW, LLC** ("Polyflow") and **JIM MOORE** ("Moore") (collectively, "Counter-Defendants"), Counter-Defendants herein and, pursuant to Fed. R. Civ. P. 15(a), for cause of action would respectfully show to the Court and jury the following:

## I.    PARTIES, JURISDICTION, AND VENUE

1.    Specialty RTP is a limited liability company with its principal place of business in Pennsylvania.

2.    Wright is an individual residing in Pennsylvania. Wright is Specialty RTP's President.

3.    Polyflow has already appeared herein and may be served by serving its counsel of record, to wit: Jeff Potts and Land Murphy, Smyser, Kaplan & Veselka, LLP, 700 Louisiana, Suite 2300, Houston, Texas 77002.

4.     Moore has already appeared herein and may be served by serving his counsel of record, to wit: Jeff Potts and Land Murphy, Smyser, Kaplan & Veselka, LLP, 700 Louisiana, Suite 2300, Houston, Texas 77002.

5.     This Court has personal jurisdiction over Polyflow because, among other reasons, it has submitted to the jurisdiction of the Southern District of Texas, Houston Division, by bringing this lawsuit as a plaintiff.  Further, by filing its claims in this Court, Polyflow has waived any objections to venue regarding compulsory or permissive counterclaims.

6.     This Court has personal jurisdiction over Moore because he purposely availed himself of the laws of Texas by establishing "minimum contacts" with the state.  For example, as previously discussed, Moore is the CEO of a company (Polyflow) with its principal offices in Texas, and Moore regularly works in Texas on Polyflow's behalf.  Furthermore, Moore has engaged in wrongful acts outside of the state of Texas that have caused harm inside the state of Texas.

7.     This Court has supplemental subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367.

## II.     FACTUAL BACKGROUND

8.     Trying to salvage Polyflow's business during a down market, Polyflow and Moore are engaging in an unlawful campaign to undermine Wright and Specialty RTP in the marketplace for the purpose of interfering with Wright's and Specialty RTP's business operations and misappropriating Wright's and Specialty RTP's business opportunities.  Polyflow's unlawful campaign includes multiple instances of false statements directed to Specialty RTP's customers and vendors that Wright has violated a restrictive covenant stemming from his former employment with Polyflow, and that Wright and Specialty RTP are misappropriating Polyflow's

intellectual property. As explained in greater detail below, these statements are false, disparaging, and defamatory, and, as was their intended purpose, are interfering with Wright's and Specialty RTP's business. To make matters worse, Polyflow also breached a contract with Specialty RTP to supply pipe for an ExxonMobil ("Exxon") project in Alabama. These actions have caused, and continue to cause, Wright and Specialty RTP business harm, and these counterclaims seek recompense for Polyflow's and Moore's unlawful actions.

### Polyflow's Formation, its Hiring of Wright, and the Expiration of Wright's Employment Agreement

9. Wright is a shareholder of Polyflow, Inc., an entity that, until 2011, manufactured and sold a line of reinforced thermoplastic pipe ("RTP Pipe") for the oil and gas industry.

10. In 2011, Polyflow acquired substantially all of the assets of Polyflow, Inc. In connection with the negotiations for that purchase, Polyflow, Inc., described in writing the full scope of the intellectual property that Polyflow ultimately purchased as follows:

COMPETITIVE BARRIERS TO ENTRY:

Polyflow does maintain a patent for the manufacture and installation of Thermoflex® for Downhole well applications and has a patent pending for its splice coupling/coupling machine. While patents are attractive assets to protect against large competitors, trade secrets surrounding the bonding of polymers, the extrusion parameters of several exotic polymers and a proprietary model to size Thermoflex tubing for specific applications provide even stronger barriers to entry. Polyflow is the sole extruder of some polymers, such as Carilon, and the Multi-layer extrusion of Fortron is also a unique capability. Plant personnel and Engineering are all subject to confidentiality agreements as well as polymer suppliers who have developed unique alloys for Polyflow.

The company has also developed a model to very accurately design the braid configurations to achieve the proper pressure and operating design parameters. The model's output details the types of reinforcement, the braid angle and the longitudinal braid configurations. The model was also tested against actual performance to certify the accuracy of the model.

In simpler terms, the full scope of the intellectual property that Polyflow acquired from Polyflow, Inc. was: (i) a patent regarding downhole well applications; (ii) a patent pending regarding a splicing machine (which is now an approved patent); (iii) a trade secret for bonding polymers relating to the inner most layer of its RTP pipe; (iv) a "model to very accurately design the braid configurations to achieve the proper pressure and operating design parameters;" and (v) the "Thermoflex" trademark. Polyflow knew or at least should have known the limits to the intellectual property it was acquiring when it executed the asset purchase agreement for substantially all the assets of Polyflow, Inc.

11.     At or about the same time of Polyflow's acquisition of the assets of Polyflow, Inc., Polyflow and Wright entered into an Employment Agreement with an "Effective Date" of April 29, 2011 ("Employment Agreement"). The Employment Agreement provided that it would expire two years from the Effective Date so long as one of the parties gave written notice at least 30 days before the expiration date that the party did not want the agreement to renew for an additional year.

12.     In accordance with the Employment Agreement's provisions, Wright gave written notice to Polyflow more than 30 days before April 29, 2013 that he did not want to renew the Employment Agreement for an additional year. The Employment Agreement then expired on April 29, 2013.

13.     Section 8.2 of the Employment Agreement contained certain non-competition and non-solicitation provisions that applied to a "Prohibited Period" defined by the Employment Agreement. Section 1.14 of the Employment Agreement defined the Prohibited Period as the period during which Wright was employed under the Employment Agreement (i.e., April 29, 2011 through April 29, 2013) plus: (a) 18 additional months on the condition that Wright

terminated the Employment Agreement for "Good Reason" pursuant to Section 3.3(a) of the agreement; (b) 24 additional months on the condition that Wright terminated the agreement for any reason other than for Good Reason pursuant to Section 3.3(a) of the agreement; (c) 18 additional months on the condition that Polyflow terminated the Employment Agreement for other than "Cause" pursuant to Section 3.2(c) of the agreement; or (d) 24 additional months on the condition that Polyflow terminated the Employment Agreement for "Cause" pursuant to Section 3.2(c) of the agreement. However, since the Employment Agreement expired by its own terms and was not terminated by either Wright or Polyflow, there was no occurrence of any of the conditions for extending the Prohibited Period beyond April 29, 2013.

**Wright's Letter Agreement with Polyflow**

14.     After the Employment Agreement expired on April 29, 2013, Polyflow and Wright entered into a letter agreement ("Letter Agreement") dated July 15, 2013. Under the Letter Agreement, Wright agreed to remain employed by Polyflow on an at-will basis. The Letter Agreement also provided, among other things, that "[i]n the course of [Wright's] continued employment, [Wright] will be expected to comply with all of the Company's policies and procedures as may be issued or amended from time to time. In addition, all terms of the Employment Agreement that survive the termination of that agreement shall remain in effect." Wright remained employed by Polyflow until October 24, 2014, when, after Wright voiced frustration with the company, Polyflow terminated his employment.

**Wright Leaves Polyflow and Discloses Plans to Engage in Worldwide Rehab Work;
Polyflow Does Not Object and Invites "Constructive Relationship."**

15.     After Wright's departure, Polyflow's attorney sent Wright a letter dated November 10, 2014. In the letter, Polyflow's attorney stated that Wright had certain obligations to Polyflow regarding non-competition, non-solicitation and non-disclosure of Polyflow's confidential

information. Polyflow's attorney also wrote in his November 10, 2014 letter: "Polyflow hopes that it will have a constructive relationship with you going forward. To that end, [Polyflow's then CEO Jim Medalie ("Medalie")] is happy to discuss any of the above points and the company's respective expectations."

16.     Wright followed up by discussing with Medalie, oftentimes during regular lunch meetings, Wright's plans and efforts to pursue a certain line of business — the rehabilitation of mature oil and gas wells and pipelines throughout the world (referred to herein as "Worldwide Rehab Work").

17.     On November 18, 2014, Wright wrote in detail to Medalie and Polyflow's Chairman, William Werdenberg ("Werdenberg"), regarding his plans to pursue Worldwide Rehab Work. Among other things, Wright wrote:

> [M]y objective is to provide oil and gas companies a way to continue to operate their mature fields through low cost rehabilitation. Sometimes the solution will involve RTP and I will have a major impact on the selection process of the RTP. In addition, customers have asked that I put a package solution together and asked you (Jim) if you would entertain selling me pipe. I have heard no response.
>
> As I said earlier, I continue to promote Polyflow as the best RTP in the world. I also will be working with a lot of oil companies around the world and can provide you with very profitable pipe sales. This may not meet with your objectives and that is fine but I will provide the consulting and engineering services to oil companies to rehabilitate their fields and there is an opportunity for Polyflow. It would have to be defined with certain performance measures to the projects are not the manufacturing schedule of last resort.
>
> In conclusion, I have a lot still invested financially in Polyflow and want it to be very successful. I left because I was fed up with the focus on one vulnerable market and second fiddle attitude toward anything but West Texas. While you may disagree with this, actions speak louder than words or business plans. Those were my sole reasons and I was not scheming to directly compete with Polyflow. I see a niche in rehab technologies that did not seem of interest to Polyflow and no one cared to learn. While I often miss the exact timing of events I always predict the trend correctly and Rehab is a short term trend and can provide both of us additional growth if you like. I am moving this way and would like to work with Polyflow, but it is not a requirement.

Let me know if you have further questions.

18.     Wright's plans did not surprise Medalie or Polyflow, as they knew that Wright had urged Polyflow for over two years to pursue Worldwide Rehab Work but that Polyflow had chosen to instead concentrate on selling RTP Pipe for the tying-in of new wells to main pipelines in West Texas ("New Well Tie-In Work").   As Wright explained in his November 18, 2014 letter, however, his Worldwide Rehab Work would involve consulting and engineering services but also presumably sometimes would involve the use of RTP Pipe as a component of the rehab work — and Wright would like to give Polyflow the opportunity to supply the RTP Pipe.

19.     On January 22, 2015, Medalie sent Wright a letter:

> I am writing with another reminder about your ongoing obligations to Polyflow and our expectation that you comply with your continuing duties to the company.
>
> As we have noted previously, your commitments with respect to non-competition and non-solicitation as set forth in Section 8.2 of your April 29, 2011 Employment Agreement will continue through April 29, 2015 (two years after the Employment Agreement was terminated by you for a reason other than Good Reason). Your commitment not to use or disclose Polyflow's confidential information, as set forth in Article VI and Section 7.1 of the Employment Agreement, also remain in place. In addition, you have an ongoing duty not to publish any oral or written statements about the Company that are slanderous, libelous or defamatory, as set forth in Section 7.1 of the Employment Agreement. These contractual provisions are in addition to all other legal obligations you have, including those with respect to the protection of Polyflow's trade secrets and non-disclosure of its confidential information.

20.     Wright then wrote back to Medalie on January 22, 2015:

> [I]t is not my intention to compete against Polyflow selling RTP pipe into the oilfield.  In addition, I keep getting the impression from your letters that you feel I am bad mouthing Polyflow in the marketplace.  This is not the case and if you have a specific example I would be glad to address it.  As I said in earlier correspondence, I still have a vested interest in the success of Polyflow and bad mouthing or derogatory comments make no sense.  Again, if you have examples please let me know we can discuss it and why they may be derogatory.

I did tell Steve [Tadlock of Polyflow's Board] and Bernard [Gouin of Polyflow's Board] that oil companies have hired me as a consultant to evaluate ways to dramatically lower their operating costs. This includes evaluating different RTP's. If you think this is competing then we have a problem and we should address it now. I have attached a presentation I made in Colombia regarding RTP and you will notice it plays right into Polyflow's strengths and only puts Polyflow in the best of lights. (By the way the pictures of Polyflow, Fiberspar, Flexsteel and Flexpipe come from websites and public presentations. The data comes from raw material suppliers.)

Lastly, with or without an agreement, your trade secrets are yours and I would not disseminate such info or use it. It is yours. But don't think the equation $\Delta P = \Delta(gz + F(rV^2 L/2) + kc(rV^2 L/2)$ is proprietary. It is physics and is online for the pressure drop of a liquid in a pipe. Trade secrets of Polyflow are in multi-layer extrusion technology and strength modeling. I understand that and will protect it. If you want to get together to discuss any specific issues you may have, let me know and I would be glad to discuss them with you. Good luck with the business and keep growing.

21.     Thus, Wright made clear to Polyflow, both orally in his many discussions with Medalie and in writing, that he intended to engage in Worldwide Rehab Work and that he did not believe such work violated any obligations to Polyflow.

### Polyflow's CEO Medalie Embraces Wright's and Specialty RTP's Engagement in Worldwide Rehab Work

22.     Neither Medalie nor anyone else at Polyflow ever voiced objection to the contents of Wright's November 18, 2014 letter, the contents of Wright's January 22, 2015 letter, or any of the additional details that Wright shared with Medalie during their many discussions regarding Wright's and Specialty RTP's business plans. Indeed, Medalie encouraged Wright to pursue Worldwide Rehab Work and expressly approved of certain plans expressed by Wright.

23.     In fact, Medalie, on Polyflow's behalf, sought to benefit Polyflow from Wright's continued involvement in the oil and gas industry and his business pursuits. For example, Medalie asked Wright to give guidance and assistance regarding Polyflow's ongoing business (including the negotiation of contract terms and technical support to execute the contract with its

customer Petronas) and asked Wright to advise certain Polyflow engineers, which Wright did. Further, Medalie contracted on Polyflow's behalf to do business with Specialty RTP and to participate in its Worldwide Rehab Work.

24.     Wright advised Medalie (without identifying the proposed customer) that Wright was seeking to obtain a rehabilitation contract for a mature oil field.  The contract ultimately would be with Exxon for an oilfield in Mobile Bay, Alabama (referenced herein as the "Exxon Alabama Contract").  Medalie did not object to Wright and Specialty RTP seeking or obtaining this contract.

25.     To the contrary, after months of discussions, Medalie thanked Wright in writing for and accepted his offer to have Polyflow subcontract with Specialty RTP to supply the RTP Pipe for the Exxon Alabama Contract.  Specifically, Polyflow expressly agreed in writing to make RTP Pipe to Specialty RTP's written specifications and to permit Specialty RTP to witness all production of the RTP Pipe to ensure that it was made as Specialty RTP wanted (this agreement shall be referenced herein as the "Polyflow Subcontract").

26.     To memorialize the Polyflow Subcontract, on March 23, 2015, Specialty RTP sent Polyflow a purchase order ("Specialty RTP Purchase Order") for RTP Pipe for the Exxon Alabama Contract in exchange for $271,440.  Polyflow prepared a sales acknowledgment, which it signed and sent to Specialty RTP ("Polyflow Sales Order Acknowledgment") in the amount of $271,440 on the next day.  In light of its expectation that Polyflow would honor the Polyflow Subcontract, Specialty RTP used Polyflow's installation manual — a public document — to show regulators examples of installation techniques.  Wright and Specialty RTP did not use Polyflow's public installation manual for any other purpose.

## Polyflow's Breach of the Polyflow Subcontract

27.     On March 26, 2015, despite Polyflow's contractual obligations, Medalie emailed Wright stating that "due to reasons beyond my control" Polyflow was "not able" to "accept your order." In a subsequent phone call, Medalie apologized to Wright and indicated that Medalie's actions had been mandated by Polyflow's "powers that be."  Wright then called Werdenberg who expressly refused to honor the Polyflow Subcontract.

28.     Thereafter, on April 10, 2015, Medalie sent Wright a letter to explain Polyflow's decision not to perform the Polyflow Subcontract.  Medalie wrote in his April 10, 2015 letter that Polyflow would not fulfill the contract because Polyflow would have to impose credit terms on Specialty RTP that "would be too onerous on [Wright] because they would include requirements of certain personal guarantees and other credit support.  Therefore, Polyflow declined the Purchase Order and advised you that we were not going to make the requested pipe . . . ."

29.     As explained in more detail below, because of Polyflow's willful and intentional breach of the Polyflow Subcontract, Specialty RTP needed to scramble to fulfill the Exxon Alabama Contract, which Specialty RTP had entered into based on Polyflow's representation that it would supply the pipe.  Accordingly, Specialty RTP worked with vendors to manufacture an RTP Pipe without using Polyflow's trade secrets or other confidential information. This manufacturing process cost Specialty RTP more than $200,000 in addition to the amount of the Polyflow Subcontract, and also caused Specialty RTP consequential damages.

## Despite Breaching the Subcontract, Polyflow Reaffirms That It Has No Objection to Specialty RTP's Worldwide Rehab Work

30.     In his April 10, 2015 letter to Wright, in addition to the aforementioned statements regarding the Exxon Alabama Contract, Medalie advised as to "what Polyflow is willing to consider going forward."  Medalie wrote:

> Polyflow would be happy to consider selling our products and services directly to end-user customers that you or Specialty RTP may represent or work for either directly or as a consultant. However, Polyflow will not sell to you or Specialty RTP directly as an agent, distributor or customer. Additionally, any relationship between you and the end user customer is between you and them and Polyflow will not enter into a financial or commission relationship with you or Specialty RTP.

31.     Of course, as of April 10, 2015, Polyflow knew that Specialty RTP was representing customers regarding Worldwide Rehab Work, which sometimes did and would involve selling the customers RTP Pipe, among other products and services. Thus, Medalie's April 10, 2015 letter reaffirmed that Polyflow did not object to Wright and Specialty RTP engaging in Worldwide Rehab Work or the sale of RTP Pipe, or to Specialty RTP's buying of that pipe from pipe suppliers other than Polyflow. Indeed, Medalie's April 10, 2015 letter expressed that Polyflow would be "happy" to consider supporting Specialty RTP's Worldwide Rehab through the supplying of RTP Pipe. Polyflow's only objection was to selling directly to Wright or Specialty RTP which, according to Polyflow, was because of a presumed lack of creditworthiness on Specialty RTP's and Wright's parts.

32.     Also, it is noteworthy that Polyflow, neither through Medalie's April 10, 2015 letter nor otherwise, objected to Specialty RTP continuing to fulfill the Exxon Alabama Contract, even though Polyflow knew that Specialty RTP would be providing rehab services to its customer and would have to buy the RTP Pipe from suppliers other than Polyflow and/or manufacture the pipe on its own.

### Polyflow Changes CEOs and Decides to Try to Steal
### Wright and Specialty RTP's Worldwide Rehab Work

33.     Soon after Medalie wrote his April 10, 2015 letter, Polyflow terminated Medalie's employment and replaced him with Moore.

34.     With Moore at Polyflow's helm, the company decided that it no longer wished to consider supplying RTP Pipe in connection with Specialty RTP's Worldwide Rehab Work but instead wanted to undermine Specialty RTP's business entirely and try to seize the business for Polyflow.

35.     Polyflow's plot to undermine Specialty RTP's business, no doubt, was born, in part, by Polyflow's substantial reduction in revenues in pursuing its core business — New Well Tie-In Work. That work had dropped off dramatically due to plummeting oil prices. Polyflow's plot also reflected a willingness (with Medalie now gone) both (a) to ignore Medalie's agreements with Wright as well as Medalie's consents to, and waivers regarding, Wright's and Specialty RTP's business plans, all of which Wright had relied upon in pursuing his business, and (b) to otherwise engage in unfair business competition to seize the Worldwide Rehab Work for Polyflow alone.

36.     Polyflow's and Moore's unfair competition against Wright and Specialty RTP has included defaming and otherwise making false accusations regarding Wright and Specialty RTP intending to interfere with Wright's and Specialty RTP's business through improper means. In particular, although previously and for months expressing no objection to Wright pursuing Worldwide Rehab Work, Polyflow and Moore began advising the marketplace that Wright was violating a restrictive covenant not to compete with Polyflow, and that Wright and Specialty RTP were misappropriating trade secrets.

37.     For example, in May of 2015, while Specialty RTP was performing the Exxon Alabama Contract, Polyflow's Moore made false accusations to Alex Watts of Exxon ("Watts") during a telephone call between Watts and Moore. Moore reiterated his false accusations to Exxon's Watts during a telephone call which Moore placed to Watts during the morning of August 17,

2015. Specifically, during that call, Moore stated to Watts that Wright was then (speaking in the present tense) subject to a "very restrictive non-compete" and "may" have violated Polyflow's intellectual property rights.

38. On August 17, 2015, Wright for the first time learned of Moore's May, 2017 and August 17, 2015 false representations to Exxon and Wright responded by sending an email on August 17, 2015 to Polyflow's Werdenberg. In the email, Wright wrote that Moore "went over the line today while emphatically stating to the marketplace that [Wright] was subject to a 'very restrictive non-compete.'" Wright added that, while he disagreed that any restrictive covenant applied to him, even Polyflow's lawyers had conceded that no restrictive covenant could possibly apply beyond April 29, 2015. Wright also pointed out that Moore's statement that Wright and Specialty RTP "may" be violating Polyflow's intellectual property rights was "a gross lie and unsubstantiated." Wright characterized Moore's statements as "premeditated slander" and warned that a failure to respond to his email within six days would result in Wright taking "appropriate action."

39. Moore emailed Wright in response on August 18, 2015. Moore claimed that "we never misstated the status of your non-competition agreement or asserted that it continued past April 29, 2015." Moore conceded, however, that he had "answered questions posed to us by a third party . . . ." Moore did not then offer, nor did he or Polyflow ever offer, to retract the false statements Moore had made to Exxon or to any other third party.

40. Moore's false statements to Exxon were intended to disrupt, and did in fact disrupt, Specialty RTP's business relationship with Exxon as Exxon ceased doing business with Wright and Specialty RTP on or before December 16, 2015 in light of Polyflow's false allegations regarding alleged violations of restrictive covenants and intellectual property rights. Specifically,

Exxon had an additional contract (referred to as the "5.6 Mile Onshore Rehab of 8" Line" in Mobile Bay) on which Specialty RTP bid, but Exxon awarded that contract instead to Polyflow because of Polyflow's and Moore's false accusations regarding Wright and Specialty RTP. Specialty RTP estimates it lost approximately $1.44 million in profits by not being awarded the contract.

41.     In or about August 2015, Polyflow, through Moore, also conversed with the Alabama Public Service Commission (the "APSC"), which regulates the pipelines associated with the Exxon Alabama Contract, and misinformed the APSC that Wright was violating a restrictive covenant with Polyflow and that Wright and Specialty RTP were misappropriating Polyflow's intellectual property. Polyflow, through Moore, made these same false accusations in person to Yazid Aziz of Ambico, a distribution company in Malaysia, and, upon information and belief, Moore and Polyflow have also made these false accusations to other actual and prospective customers and vendors of Specialty RTP.

42.     Of course, as explained in the paragraphs below, Polyflow's and Moore's accusations that Wright has violated a restrictive covenant and that Wright and Specialty RTP have misappropriated Polyflow's intellectual property, after months of not objecting to Specialty RTP's pursuit of Worldwide Rehab Work and even entering into a contract to participate, are knowingly false. As also explained in the paragraphs below, the allegations are being made maliciously to gain an unfair business advantage by undermining and disrupting Wright's and Specialty RTP's business.

### Polyflow's and Moore's Accusations that Wright has violated a Restrictive Covenant Are Knowingly False

43.     Wright has not breached any restrictive covenants with Polyflow.

44.     First, as discussed above, the Prohibited Period under the Employment Agreement ended April 29, 2013, almost 18 months <u>before</u> Wright left Polyflow.

45.     Second, even if the Prohibited Period had extended until April 29, 2015, as Polyflow incorrectly contends, Wright would not have been in violation of the terms of the restrictive covenant during that time period.  The restrictive covenant was only enforceable to the extent of its written terms and to the extent that it was reasonable and necessary to protect Polyflow's legitimate interests.  Polyflow had no legitimate interest in prohibiting Wright from pursuing Worldwide Rehab Work in the months between his departure from Polyflow on October 24, 2014, until April 29, 2015, because Polyflow was not pursuing the same work as Wright and Specialty RTP during that time period.  Thus, Wright and Specialty RTP were not competing with Polyflow.  In fact, Polyflow's interests were actually aligned with Wright's in his pursuit of Worldwide Rehab Work.  It provided Polyflow the opportunity for subcontracting to supply RTP Pipe for contracts that Specialty RTP might, and did, obtain.  Such subcontracting work would have allowed Polyflow to benefit from an industry in which it did not otherwise participate.  Further, Polyflow did in fact benefit from Wright's continued involvement in the oil and gas industry, and Polyflow asked for, and received, his advice on its projects.  It is probably for these reasons that Medalie encouraged Wright in his work.

46.     Third, as detailed above, Medalie, on Polyflow's behalf — and because it made good business sense — waived any contractual rights that Polyflow had to object to Wright's business pursuits.  Indeed, as of April 10, 2015 (19 days before Polyflow contends that the restrictive covenant period ended), Polyflow voiced no objection to Wright's pursuit of Worldwide Rehab Work, and even reaffirmed Polyflow's interest in participating in it as a supplier of RTP Pipe to Wright's customers.

47.     Fourth, the only contract that Specialty RTP entered into that involved the sale of RTP

pipe on or about April 29, 2015 was the Exxon Alabama Contract, which Polyflow knew about

and agreed to participate in through the Polyflow Subcontract.

**Polyflow's and Moore's Accusation that Wright and Specialty RTP are Misappropriating Polyflow's Intellectual Property is Knowingly False**

48.     Moreover, contrary to Polyflow's and Moore's false accusations, Wright and Specialty

RTP have not misappropriated any of Polyflow's intellectual property.

49.     As discussed above, the full scope of the intellectual property that Polyflow acquired

from Polyflow, Inc. was: (i) a patent regarding downhole well applications; (ii) a patent

regarding a splicing machine; (iii) a trade secret for bonding polymers relating to the inner most

layer of its RTP pipe; (iv) a "model to very accurately design the braid configurations to achieve

the proper pressure and operating design parameters;" and (v) the "Thermoflex" trademark.

50.     Wright and Specialty RTP have not misappropriated any of this intellectual property:

    a.  Concerning the patent regarding downhole well applications, Specialty RTP and
        Wright have not used, and will not use, this technology.  In fact, Polyflow itself
        no longer uses this technology.

    b.  Concerning Polyflow's patent regarding a splicing machine, Specialty RTP and
        Wright lawfully use this technology through the purchase of one such machine
        through a Polyflow distributor and by renting two such machines from two
        different Polyflow distributors that bought them from Polyflow.

    c.  Polyflow's purported trade secret for bonding polymers relates to the inner most
        layer of its RTP pipe. By way of background, the RTP pipe is comprised of three
        layers: (i) an inner liner for corrosion resistance, low permeation properties and a
        low friction flow path (this inner layer is comprised of three sub-layers); (ii) a
        layer of braiding on the outside with a cross mesh of aramid fibers and
        longitudinal fiber for burst strength and elongation resistance; and (iii) an outer
        jacket which provides an abrasion resistance cover to protect the braiding and a
        corrosion resistance barrier.  Neither Wright nor Specialty RTP knows Polyflow's
        trade secret for bonding polymers, and Wright and Specialty RTP have not used
        it.   This trade secret historically has resided solely with Polyflow's David
        Kearney and in written form in a TD Bank safety deposit box.  When Specialty
        RTP had to create the inner liner of RTP Pipe after Polyflow breached the

Polyflow Subcontract, Wright hired a subcontractor (which also did not know Polyflow's purported trade secret) to engage in an extended process of designing an inner liner using the subcontractor's existing dies, construction, and equipment. Specialty RTP now uses the inner liner that it and its subcontractor designed through this process.

d. Polyflow's only other purported trade secret is its "model to very accurately design the braid configurations to achieve the proper pressure and operating design parameters." Although Wright knows *of* this model, Wright does not know this purported trade secret and certainly has not used it. In fact, as Polyflow has known since the negotiations leading to the Polyflow Subcontract, Wright has designed for Specialty RTP an alternative braiding method by applying generally known physics formulas. Indeed, the Specialty RTP Purchase Order, among other documents, reflected that Specialty RTP wanted Polyflow to use a particular, defined braiding method and thus not Polyflow's model for determining how to braid.

e. Finally, Specialty RTP and Wright have not infringed upon the "Thermoflex" trademark.

Accordingly, Moore's and Polyflow's accusations that Wright and Specialty RTP are misappropriating Polyflow's intellectual property are knowingly false.

## III. CAUSES OF ACTION

### Count I: Breach of Polyflow subcontract
### Specialty RTP v. Polyflow

51. The preceding paragraphs are incorporated herein by reference as if set out in full.

52. The Polyflow Subcontract was and is a valid contract — Polyflow accepted the order, confirmed it, and it was in Polyflow's system for three days before Polyflow's decision to breach the Subcontract. Specialty RTP fully performed its obligations under the Polyflow Subcontract.

53. Polyflow breached the Polyflow Subcontract by refusing to honor, and by unilaterally purporting to cancel, what was a binding agreement with Specialty RTP to supply RTP Pipe for the Exxon Alabama Contract.

54. As a result of Polyflow's breach of the Polyflow Subcontract, Specialty RTP suffered direct and consequential damages. Specifically, Specialty RTP was forced to spend over

$200,000 to manufacture its own RTP Pipe as a result of Polyflow's breach, and also incurred additional consequential damages due to Polyflow's breach.

55.     Moreover, as a result of Polyflow's actions, Specialty RTP was required to retain counsel to prosecute this claim, and is therefore entitled to recover its reasonable and necessary attorney's fees, costs, and expenses from Polyflow.

56.     All conditions precedent to Specialty RTP's breach of contract claim have occurred or been satisfied.

### Count II:  Business Disparagement
### Wright and Specialty RTP v. Polyflow and Moore

57.     The preceding paragraphs are incorporated herein by reference as if set out in full.

58.     Moore and Polyflow published disparaging words about Wright's and Specialty RTP's economic interests to third parties when Moore and Polyflow falsely stated to Exxon, the ASPC, Ambico, and others, that Wright violated restrictive covenants not to compete with Polyflow and that Wright and Specialty RTP were misappropriating Polyflow's intellectual property, which cast doubt on the quality and ownership of Wright's and Specialty RTP's business products and on the character of their business as a whole.  When making these disparaging statements, Moore was acting within the scope of his authority as Polyflow's CEO, and made the disparaging statements in furtherance of Polyflow's business.

59.     Moore and Polyflow's disparaging words about Wright's and Specialty RTP's economic interests were false and were made without privilege.

60.     Moore and Polyflow published these disparaging words with actual malice because they were made with knowledge of their falsity or, alternatively, with reckless disregard for their truth.  Moreover, Moore and Polyflow published the false and disparaging words with ill will and with the intent to interfere with Wright's and Specialty RTP's economic interests — namely,

Wright's and Specialty RTP's business relationships with third parties —intending that Polyflow will obtain the business relationships with such third parties for itself.

61.     Wright and Specialty RTP have suffered and are continuing to suffer special damages – pecuniary losses that have been realized - as a result of Moore's and Polyflow's conduct.  For example, as previously discussed, Exxon has ceased its business relationship with Wright and Specialty RTP as a result of the false and disparaging words about Wright and Specialty RTP published by Moore and Polyflow.  Wright and Specialty RTP expect to discover proof of additional lost business representing special damages through the course of discovery.  In addition, Wright and Specialty RTP seek damages for all expenses incurred in taking measures to counteract Moore's and Polyflow's disparaging statements.

62.     Wright and Specialty RTP also seek exemplary damages because Moore's and Polyflow's conduct was outrageous and malicious.

63.     All conditions precedent to Wright's and Specialty RTP's business disparagement claim have occurred or been satisfied.

**Count III:  Defamation and Defamation Per Se**
**Wright and Specialty RTP v. Polyflow and Moore**

64.     The preceding paragraphs are incorporated herein by reference as if set out in full.

65.     Moore and Polyflow published false statements of fact regarding Wright and Specialty RTP to third parties when they falsely stated to Exxon, the APSC, and Ambico that Wright violated restrictive covenants not to compete with Polyflow and misappropriated Polyflow's intellectual property.

66.     Moore and Polyflow are strictly liable for their defamatory statements.  Alternatively, Moore's and Polyflow's defamatory statements were made with actual malice because the false accusations were made with knowledge of their falsity or with reckless disregard for their truth.

Further, and in the alternative, Moore and Polyflow made the defamatory statements negligently because they (a) knew or should have known the statements were false, and (b) a reasonably prudent person would have been warned that the content of the statements had the potential to be defamatory.

67.     Moore and Polyflow's statements were defamatory per se because they were obviously harmful due to the loss of reputation suffered by Wright and Specialty RTP; therefore, they do not require proof of damages.   Alternatively, as a result of Moore's and Polyflow's false statements of fact, Wright and Specialty RTP have suffered special and general damages, including the loss of business from customers, including but not limited to Exxon.

68.     All conditions precedent to Wright's and Specialty RTP's defamation claim have occurred or been satisfied including, but not limited to, satisfaction of the Texas Defamation Mitigation Act, Tex. Civ. Prac. & Rem. Code, §73.055.

### Count IV:  Tortious Interference with Existing and Prospective Business Relations
### Wright and Specialty RTP v. Polyflow and Moore

69.     The preceding paragraphs are incorporated herein by reference as if set out in full.

70.     Moore and Polyflow have made their false statements of fact regarding Wright and Specialty RTP with the purpose or intent to harm Wright and Specialty RTP by, among other things, interfering with Wright and Specialty's existing and prospective business relationships.

71.     There was a reasonable probability that Wright and Specialty RTP would have continued ongoing business relationships and entered into additional business relationships with Exxon, among others.

72.     Moore and Polyflow interfered with existing contracts by making the above-referenced false, disparaging, and defamatory statements about Wright's and Specialty RTP's alleged violation of restrictive covenants and misappropriation of Polyflow's confidential information

and by refusing to supply pipe for the Exxon Alabama Contract after initially agreeing to do so. Moore's and Polyflow's acts of interference were willful and intentional.

73.     Moreover, Moore's and Polyflow's actions prevented Wright and Specialty RTP from entering into additional business relationships with Exxon, among others, as demonstrated by Tim Anderson's December 16, 2015 email to Wright.

74.     Moore and Polyflow further acted with a conscious desire to prevent Wright and Specialty RTP from forming a business relationship with Exxon.  Alternatively, Moore and Polyflow knew their actions were certain or substantially certain to prevent Wright and Specialty from forming a business relationship with Exxon.

75.     Moore's and Polyflow's actions have been taken without privilege or justification.

76.     Moore's and Polyflow's actions have caused Wright and Specialty to suffer actual harm or damages and were a proximate cause of such actual harm or damages, including but not limited to direct and consequential damages

77.      All conditions precedent to Wright's and Specialty RTP's tortious interference with prospective business relations claim have occurred or been satisfied.

### Count V:  Unfair Competition
### Wright and Specialty RTP v. Polyflow and Moore

78.     All of the preceding paragraphs are incorporated herein by reference.

79.     Moore and Polyflow's action constitute unfair competition under the laws of the State of Texas.

80.     Moore and Polyflow have unfairly competed with Wright and Specialty RTP by virtue of the business disparagement, defamation, and tortious interference with existing and prospective business relations described above.

81.     Defendants' acts of unfair competition have damaged and will continue to damage the business and goodwill of Specialty RTP and Wright.

82.     All conditions precedent to Wright's and Specialty RTP's unfair competition claim have occurred or been satisfied.

## IV.     PRAYER

For the foregoing reasons, Defendants/Counter-Plaintiffs Specialty RTP, LLC, and John R. Wright, Jr., ask that Plaintiff/Counter-Defendant Polyflow, LLC, take nothing by way of its claims, and that Defendants be awarded the following relief against Plaintiff/Counter-Defendant and Third Party Defendant Jim Moore:

(a)     Actual damages;

(b)     Exemplary damages;

(c)     Attorneys' fees, costs, and expenses;

(d)     Pre- and post-judgment interest; and

(e)     All other relief to which Defendants are entitled.

Respectfully submitted,

**LAPIN & LANDA, L.L.P.**

/s/ Robert E. Lapin
By: Robert E. Lapin
State Bar Card No. 11945050
Federal Bar Card No. 6249
500 Jefferson St., Suite 2000
Houston, TX 77002-7337
(713) 756-3232
(713) 654-7804 – Facsimile
blapin@lapinlanda.com

**ATTORNEYS FOR
DEFENDANTS/COUNTER
PLAINTIFFS SPECIALTY RTP, LLC
and JOHN R. WRIGHT, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of October, 2016, a true and correct copy of this document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorney(s) of record.

Jeff Potts
Land Murphy
Smyser, Kaplan & Veselka, LLP
700 Louisiana, Suite 2300
Houston, Texas 77002


_/s/  Robert E. Lapin_
Robert E. Lapin