United States District Court
Southern District of Texas

**ENTERED**

November 30, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| POLYFLOW, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:15-cv-02817 |
| | § | |
| SPECIALTY RTP, LLC, *et al.*, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER
ON PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' AMENDED
COUNTERCLAIM UNDER RULE 12(B)(6)**

In this case, Plaintiff Polyflow, LLC ["Plaintiff," "Polyflow,"] has sued Defendants John R. Wright Jr. ["Wright"] and Specialty RTP, LLC ["Specialty RTP"] for breach of contract, misappropriation of trade secrets, tortious interference with existing and prospective business relationships, trademark infringement, unfair competition, trademark dilution, and false advertising. (Docket Entry #1 ["Complaint"] ¶¶ 60-127). Defendants have filed a counterpetition against Polyflow and Jim Moore ["Moore"], asserting claims for breach of contract, business disparagement, defamation, defamation per se, tortious interference with existing and prospective business relationships, and unfair competition. (Defendants' First Amended Counterclaim Against Plaintiff Polyflow, LLC and Jim Moore ["Counterclaim"] ¶¶ 51-82, Docket Entry #72). The parties have consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636 (c). (Docket Entry #19). Before the court is Plaintiff's motion to dismiss. (Motion to Dismiss Defendants' Amended Counterclaim Under Rule 12(B)(6) ["Motion"], Docket Entry #75). Defendants have responded. (Response to Motion to Dismiss Amended Counterclaim Under Rule 12(b)(6) ["Response"], Docket Entry #80). After considering

the pleadings, the evidence submitted, and the applicable law, Plaintiff's motion is **GRANTED**, in part, and **DENIED**, in part.

## Background

Polyflow manufactures and sells specially-formulated reinforced thermoplastic pipe ["RTP"] for use in the oil and natural gas industry. (Complaint ¶¶ 2, 9). Polyflow's RTP product is marketed and sold under the federally-registered trademark of "Thermoflex." (*Id*. at ¶¶ 9, 78). Polyflow also operates a steel pipe rehabilitation program, called "ExPERT."[1] (*Id*. ¶ 13).

On April 29, 2011, Wright entered into an Employment Agreement with Polyflow, under which he agreed to serve as the company's president for a two-year period. (Complaint ¶18; Amended Counterclaim ¶ 11; Defendants' Amended Motion to Transfer Venue at Exhibit ["Ex."] A ["Employment Agreement"] §§ 2.1, 3.1, Docket Entry #27). The Employment Agreement was automatically renewed for consecutive one-year periods, unless either party gave written notice of termination at least thirty days before the expiration date. (Employment Agreement § 3.1). The contract detailed, among other things, Wright's compensation amount, as well as certain restrictive covenants concerning other employment, and severance payouts, should he leave the company. (*See* Employment Agreement §§ 3.1-3.4, 4.1- 4.6, 8.1- 8.5). For example, Article VI of the Employment Agreement prohibited Wright from making "any unauthorized disclosure of [Polyflow's] Confidential Information or Work Product" for five years after his employment ended. (*Id*. § 6.3). Further, Article VII of the Agreement specified that Wright was to refrain, "both during his employment and after the termination of [his] employment," from making statements about Poyflow that were deemed to be "slanderous, libelous[,] or defamatory;" statements that "disclosed[d] Confidential Information of the Company;" or statements that "place[d] [Polyflow] in a false light

---

[1]"ExPERT" is an acronym for "Existing Pipe Enhanced Rehabilitation Technologies." (Complaint ¶ 13).

before the public." (*Id.* § 7.1). Another section, Article VIII, was a non-competition clause, which was intended to preclude Wright from competing with Polyflow for two years following his employment with the company. (*See id.* § 8.2).

Under its express terms, the Employment Agreement expired on April 29, 2013. (*See id.* § 3.1). Wright alleges that he gave timely, written notice of his intent to resign from Polyflow, which precluded the one-year option renewal. (Counterclaim ¶12; Plaintiff's Response in Opposition to Defendants' Amended Motion to Transfer Venue ["Response to Motion to Transfer Venue"] Ex. A ["Wright's June 30, 2013 Letter to Polyflow Executives"], Docket Entry #32). However, throughout May and June of 2013, the parties negotiated the terms of a new employment contract, while Wright continued to work for Polyflow, in an at-will capacity. (Counterclaim ¶ 14; Wright's June 30, 2013 Letter to Polyflow Executives). On July 15, 2013, the parties executed a Letter Agreement, which stated, in relevant part, as follows:

> This letter sets forth the terms of your continued employment with Polyflow, LLC (the "Company"). Effective as of [July 15, 2013], you will continue in your capacity as President of the Company, subject to the terms of this letter agreement.
>
> ***
>
> The term "Cause" means: . . . (e) your violation of the provisions of Article VI ("Protection of Information"), VII ("Statements Concerning the Company and Executive"), or VIII ("Non-Competition Agreement") of the Employment Agreement entered into between you and the Company as of April 29, 2011 (the "Employment Agreement") or any Proprietary Information and Inventions Assignment Agreement between you and the Company or any of its affiliates[.]
>
> ***
>
> In the course of your continued employment, you will be expected to comply with all of the Company's policies and procedures as may be issued or amended from time to time. In addition all terms of the Employment Agreement that survive the termination of that agreement shall remain in effect[.].

(Motion to Transfer Venue Ex. B ["Letter Agreement"] at 2-3). Wright maintains that he worked

3

for Polyflow until October 24, 2014, when, "after voic[ing] frustration with the company," Polyflow terminated his employment. (Counterclaim ¶14).

### The Formation of Specialty RTP

Wright claims that, following his termination, Polyflow expressed interest in developing a "constructive [business] relationship" with him. (*See id.* ¶15). He alleges that he told Jim Medalie ["Medalie"], then CEO of Polyflow, that he planned to form a new company, Specialty RTP, to provide consulting and engineering services for the rehabilitation of mature oil and gas wells and pipelines. (*Id.* ¶¶ 16, 17). Apparently, Medalie never objected to Wright's business plan. (*Id.* ¶ 22). On November 18, 2014, Wright wrote to Medalie and William Werdenberg ["Werdenberg"], then Chairman of Polyflow, to request purchases of RTP from Plaintiff for use in rehabilitation projects. (*Id.* ¶ 17). He stated that he did not intend "to directly compete with Polyflow[,]" but instead wanted to exploit a "niche in rehab technologies that did not seem [to be] of interest" to Polyflow. (*Id.*). Wright added that he consistently "promote[s] Polyflow as the best RTP [manufacturer] in the world," and that he maintained a large financial investment in the company. (*Id.* ¶ 17). He repeatedly expressed interest in an arrangement with Plaintiff , in which Specialty RTP would provide "low cost rehabilitation [services]," and Polyflow would supply the RTP required to perform those services. (*Id.*).

Medalie countered Wright's proposition with a note reminding Wright of his "ongoing obligations to Polyflow[.]"(*Id.* ¶ 19). In fact, in a letter dated January 22, 2015, Medalie emphasized the importance of Wright's compliance with the non-competition, non-solicitation, and confidentiality clauses of the Employment Agreement. Wright responded, denying that he had violated any of those provisions. (*Id.* ¶ 20). He stressed that he had a "vested interest in the success

4

of Polyflow, and [that] bad mouthing or [expressing] derogatory comments [about Polyflow made] no sense." (*Id*.). Wright repeated that he had always presented Polyflow "in the best of lights," and that he had never used any confidential information. (*See id.*).

Without express objection from Polyflow, Wright began to solicit clients and work opportunities for Specialty RTP. (*Id*. ¶¶ 23-26). In the spring of 2015, Specialty RTP secured a contract to rehabilitate an Exxon oilfield in Mobile Bay Alabama ["Exxon Alabama Contract"]. (*Id*. ¶ 24). Specialty RTP then executed a subcontract with Plaintiff , in which Polyflow expressly agreed to produce RTP for that project ["Polyflow Subcontract"]. (*Id*. ¶ 25). Specialty RTP also acquired the rights to oversee production of the pipe, as well as post production inspection of the pipe to ensure that it satisfied all design specifications. (*Id*.). On March 23, 2015, Specialty RTP sent Polyflow a purchase order, in the amount of $271,440 ["Specialty RTP Purchase Order"], and the following day, Polyflow sent a sales order acknowledging it ["Polyflow Sales Order Acknowledgment"]. (*Id*. ¶ 26).[2] On March 26, 2015, however, Medalie notified Wright that Polyflow would not fulfill the terms of the subcontract.[3] (*Id*. ¶ 27). Wright claims that, as a result of Polyflow's action, he had to "scramble" to locate another manufacturer to supply the RTP for the Exxon Alabama Contract, and, in doing so, spent more than $200,000 over the amount bargained for in the Polyflow Subcontract. (*Id*. ¶ 29).

### *Moore Becomes CEO of Polyflow*

---

[2]Neither party has included a copy of the Exxon Alabama Contract, the Polyflow Subcontract, the Specialty RTP Purchase Order, or the Polyflow Sales Order Acknowledgment.

[3]Later, on April 10, 2015, Medalie explained that Polyflow chose not to perform on the subcontract, because the company "would have to impose credit terms on Specialty RTP that 'would be too onerous on [Wright.]'" (Amended Counterclaim ¶ 28).

5

In April or May, 2015, Polyflow terminated Medalie's employment, and Jim Moore ["Moore"] succeeded him. (*Id*. ¶ 33). Defendants allege that, acting on Moore's instruction, Polyflow implemented a "plot to undermine Specialty RTP [, by] [] engag[ing] in unfair business [practices]," so that Plaintiff could acquire Speciality RTP's rehabilitation work for itself. (*Id*. ¶ 35). Defendants complain, specifically, that Polyflow and Moore made defamatory statements to others in the oil and gas market that Wright had been acting in violation of a non-competition agreement, and that he had been misappropriating Polyflow's trade secrets. (*Id*. ¶ 36). For example, Defendants allege that, during a telephone call in May, 2015, Moore notified Alex Watts ["Watts"], a project engineer at Exxon, that Wright had violated a covenant not-to-compete by committing Specialty RTP to the Exxon Alabama Contract. (*See id.* ¶ 37). They claim that Moore also called Watts on August 17, 2015, and repeated that Wright was "subject to a 'very restrictive non-compete [agreement,]' and [that he] 'may' have violated Polyflow's intellectual property rights." (*Id*.).Defendants contend further that, in August, 2015, Moore informed the Alabama Public Service Commission ["ASPC"] that Wright was violating a covenant not-to-compete with Polyflow, and improperly divulging the company's intellectual property. (*Id*. ¶ 41). They complain that Moore made similar allegations, in person, to Yazid Aziz ["Aziz"], a representative of Ambico Offshore. (*Id*. ¶ 41). Defendants claim that Moore made these statements maliciously, in an effort to "gain an unfair business advantage" over Specialty RTP. (*Id*. ¶ 42)

Wright maintains that he first learned of Moore's defamatory statements on August 17, 2015. (Counterclaim ¶ 38, Response at 8). On that day, Wright sent Werdenberg an email, complaining that Moore "went over the line [by telling Watts] that [he] was subject to a 'very restrictive non-compete.'" (*Id*.). Wright also claimed that "even Polyflow's lawyers had conceded that [the]

6

restrictive covenant could [not] apply beyond April 29, 2015." (*Id*.). On August 18, 2015, Moore replied that he had "never misstated that status of [Wright's] non-competition agreement or asserted that it continued past April 29, 2015." (Counterclaim ¶ 39). He claimed only to have "answered questions posed [] by third part[ies]." (*Id*.). Nonetheless, Defendants insist that its business relationship with Exxon suffered because of Moore's false statements. (*Id*. ¶ 40). Indeed, Specialty RTP alleges, that, in December, 2015, it bid on an Exxon contract, but the contract was awarded to Polyflow instead. Specialty RTP estimates that it lost approximately $1.44 million in profits as a result of losing that Exxon contract. (*Id*.).

On September 28, 2015, Polyflow filed this lawsuit, alleging that Wright and Specialty RTP engaged in the misappropriation of trade secrets, trademark infringement, false advertising, unfair competition, trademark dilution, tortious interference with actual and prospective business relationships, and injury to a business relationship. (Complaint). On September 13, 2016, Specialty RTP and Wright filed counterclaims against Polyflow and Moore for breach of contract, business disparagement, defamation and defamation per se, tortious interference with existing and prospective business relations, and unfair competition. (*Id*. ¶¶ 48-79). Two weeks later, Plaintiff filed a motion to dismiss that pleading for failure to state a claim. (Motion to Dismiss Under Rule 12(B)(6), Docket Entry #67).On October 17, 2016, Defendants then filed a first amended counterpetition, clarifying factual allegations and expanding on its legal claims. (Counterclaim; Response at 2). Plaintiff then filed a second motion to dismiss the amended counterclaim under Federal Rule of Civil Procedure 12(b)(6). (Motion). From a review of the pleadings, the evidence submitted, and the applicable law, the court concludes that Plaintiff's motion should be granted, in part, and denied, in part.

**Standard of Review**

7

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true, and view them in the light most favorable to the plaintiff. *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (quoting *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)). "To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555. ("Factual allegations must be enough to raise a right to relief above the speculative level."). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged –but it has not 'shown' –'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting FED. R. CIV. P. 8(a)(2)). "Threadbare recital of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

In ruling on a Rule 12(b)(6) motion, the court typically may not look beyond the pleadings. *Hall v. Hodgkins*, 305 F.App'x 224, 227 (5th Cir. 2008) (citing *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994)). "Pleadings," for purposes of a Rule 12(b)(6) motion, however, include attachments to the complaint, documents incorporated into the complaint by reference, and information subject

to judicial notice. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). Documents "attache[d] to a motion to dismiss are considered to be a part of the pleadings, if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (internal quotation marks omitted); *accord Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003); *see Johnson v. Wells Fargo Bank, N.A.*, 999 F.Supp.2d 919, 926 (N.D. Tex. 2014) ("[D]ocuments are central when they are necessary to establish an element of one of the plaintiff's claims.").

**Discussion**

### *Defamation Mitigation Act*

At the outset, Plaintiff argues that Defendants' defamation claims must be dismissed, because they have not complied with the Texas Defamation Mitigation Act ["TDMA"]. (Motion at 5-7). Under that statute, an individual can pursue an action for defamation *only if* he has made a "timely and sufficient request for a correction, clarification, or retraction from the defendant[.]" TEX. CIV. PRAC. REM. CODE. § 73.055 (a)(1) (emphasis added). Any request made under this provision is deemed sufficient if it "(1) is served on the publisher; (2) is made in writing, reasonably identifies the person making the request, and is signed by the individual claiming to have been defamed[;] (3) [] particular[ly identifies] the statement alleged to be false and defamatory and, to the extent known, the time and place of publication;(4) alleges the defamatory meaning of the statement; and (5) specifies the circumstances causing the defamatory meaning," if that is not clear from the language of the statement itself. *Id.* at § 73.055(d). Such a request must be made within the one-year statute of limitations period for a defamation claim. *Id.* at §§ 16.002(a), 73.055(b).

In response to this argument, Defendants maintain that Wright's email to Werdenberg on August 17, 2015 satisfies the Act's requirements, because Wright "identif[ied] the defamatory [statement that] Moore [made to Exxon,] and demanded [that Polyflow correct the statement.]"

(Counterclaim ¶ 68; Response at 8). Plaintiff, on the other hand, alleges that the email was not a "request for a correction, clarification, or retraction[,]" but, was, instead, an accusation of "premeditated slander," and a threat to take "appropriate action" if Polyflow "failed to respond [] within six days[.]" (Motion at 6; Counterclaim ¶ 38). Plaintiff insists that Wright's email fails to request appropriate mitigation under the Act, so Defendants' defamation claims must be dismissed. (Motion at 6-7).

Here, Defendants appear to have satisfied the Act. Although Wright's email did not use the express terms "correct," "clarify," or "retract," it implicitly requested that Moore cease making any defamatory remarks, and that Polyflow promptly promise to remedy the damage that Wright had incurred. (*See* Counterclaim ¶ 38). Moreover, the email appears to be statutorily "sufficient," having complied with § 73.055(d)'s requirements, in that it is a written request from Wright; it was served on the publisher; and it particularly identifies the defamatory statement, its meaning, and the circumstances surrounding its publication. (*See* Counterclaim ¶ 38). On this record, Defendants have satisfied the state law prerequisites to pursue a defamation claim, based on Moore's alleged statements to Exxon. It is also important to note that Wright's request for mitigation did not mention Moore's statements to the ASPC or Ambico Offshore. (Counterclaim ¶ 68; Response at 8). Because Defendants failed to request appropriate mitigation of the statements on the ASPC or Ambico Offshore, any defamation claims predicated on those statements are dismissed.[4]

---

[4]Defendants argue that the alleged "inadequacy" of Wright's email is an inappropriate basis on which to dismiss its defamation claims, because the court must evaluate the complete text of that email to determine whether it constitutes appropriate mitigation under the TDMA. (Response at 9). But, even had Defendants requested that Moore retract his comments to the ASPC and Ambico Offshore were made, any defamation claims predicated on those remarks fail, because Defendants have not stated sufficient facts to state a claim for relief. "Defamation claims must specifically state the time and place of the publication, as well as the alleged defamatory statement and the speaker." *Vendever LLC v. Intermatic Manufacturing Ltd.*, No. 3:11-cv-201-B, 2011 WL 4346324, at *5 (N.D. Tex. Sept. 16, 2011) (citations omitted). Here, Defendants' have not offered any details regarding the circumstances under which Moore's alleged comments to the ASPC and Ambico Offshore were made. With regard to the ASPC, Defendants claim that Moore "misinformed the ASPC that Wright was violating a restrictive covenant[,]" and that he was misappropriating Polyflow's intellectual property" sometime "in or about August 2015[.]" (Counterclaim ¶ 41). However, Wright has not provided any details about any ASPC employee to whom Moore spoke, or how contact

### *Defamation & Business Disparagement Claims*

Defendants have stated claims for defamation, as well as business disparagement. (Counterclaim ¶ ¶ 57-68). Plaintiff argues that, because Defendants have failed to state a claim for defamation, they likewise have failed to state a claim for business disparagement, because these two torts require proof of the same legal elements. (Motion at 1, 9). However, at the outset, it is important to distinguish these torts. While both involve a harm that results from publishing false information, each cause of action protects a different interest. *Waste Management of Texas, Inc. v. Texas Disposal Sys. Landfill Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). "Whereas 'defamation actions chiefly serve to protect the personal reputation of an injured party, [] a business disparagement claim protects economic interests.'" *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (quoting *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). It is possible, then, to impugn one's reputation without disparaging its commercial interests, and vice versa. *Id.* For that reason, depending on the circumstances, a litigant may have a claim for defamation, or for business disparagement, or for both. *Id.*

### *Defamation*

An action for defamation under Texas law has three elements: (1) the publication of a statement of fact concerning the claimant to a third party; (2) that was defamatory; and (3) that was made with actual malice (if the claimant was a public official or figure), or with negligence (if the claimant was a private individual) regarding the truth of the statement. *Cuba v. Pylant*, 814 F.3d 701,

---

between Moore and the ASPC was initiated. By failing to do so, Defendants have not pled facts in support of the publication element of their claims. *Desperado Motor Racing & Motor Cycles, Inc. v. Robinson*, No. Civ. A. H. 09-1574, 2010 WL2757523, at *3 (S.D. Tex. July 13, 2010) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). Likewise, Defendants have provided scant factual allegations concerning Moore's communication with Ambico Offshore. Although Defendants claim that the remarks were made to Aziz, "in person," they have not alleged when, or the context in which, the comments were made. (*Id.* ¶ 41). Without more specific information about Moore's remarks to the ASPC and Aziz, the court is unable "to draw the reasonable inference that [Plaintiff] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. Accordingly, those claims fail.

713-14 (5th Cir. 2016); *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). The claimant must also plead and prove damages, unless the defamatory statements are defamatory per se. *Waste Management of Texas, Inc*., 434 S.W.3d at 162 n.7.

Defendants allege that Moore "published false statements of fact" regarding their reputation. (*See* Counterclaim ¶ 65). They claim, specifically, that Moore told representatives of Exxon that Wright was violating a non-compete agreement, and that he used Plaintiff's intellectual property without authorization. (*Id*. ¶37, 65). Defendants base their defamation claim on Moore's remarks over the telephone, to Alex Watts ["Watts"], an Exxon employee, in May, 2015, and in August, 2015. (*Id*.). Defendants contend that these statements were made with actual malice to "gain an unfair business advantage" over Specialty RTP, and to disrupt the company's business. (*Id*. ¶ 42, 66). In the alternative, they contend that these remarks were made negligently, because Moore "knew or should have known that they were false," and that the comments were potentially defamatory. (*Id*. ¶ 67). Defendants claim that they lost Exxon's business because of Moore's defamatory remarks. (*Id*.).

Plaintiff, on the other hand, argues that Moore's statement that Wright "*was* subject to a very restrictive non-compete" is not "actionable," because it is a statement of opinion, which "expresses Moore's uncertainty on the subject." (Motion at 8-9) (emphasis in original). To be actionable, an allegedly defamatory statement must be a verifiable fact rather than an opinion. *See Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."). Nevertheless, a statement couched as an opinion may be actionable if it expressly or impliedly asserts facts that can be objectively verified. *See Milkovich v. Lorain Journal*

*Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990);[5] *Bentley v. Bunton*, 94 S.W.3d 561, 579-80 (Tex. 2003); *Avila v. Larrea,* 394 S.W.3d 646, 658 (Tex. App.–Dallas 2012, pet. denied). "Whether a publication is an actionable statement of fact is a question of law. *Bentley,* 94 S.W.3d at 580. The analysis depends on a "reasonable person's perception of the entirety of the publication and not merely on individual statements." *Id.* at 579 (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)).

Here, Moore apparently told Watts that Wright was violating "a very restrictive non-compete" agreement, and that Wright "may" have violated Polyflow's intellectual property rights. (Counterclaim ¶ 37). The term "very restrictive" speaks to Moore's subjective impression of the severity of the non-compete agreement, and as such, is not objectively verifiable. *Zimmer*, 257 S.W.3d at 510 (statement describing obscene gesture as "worst thing" speaker had observed found to be subjective statement). However, it is clear that the remainder of Moore's statement is capable of being objectively verified. Whether Wright complied with the Employment Agreement can be determined by ascertaining the terms of the agreement, and evaluating Wright's behavior during the relevant period.

Nonetheless, Plaintiff is adamant that Moore's comment that Wright "*may*" have infringed Polyflow's intellectual property rights merely expresses an "uncertain[ty] as to whether Wright did or did not do so[]." (Motion at 9) (emphasis in original). However, "when the speaker states the facts upon which he bases his opinion, and those facts are either incorrect or incomplete, or his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Zimmer*,

---

[5]In *Milkovich*, the Supreme Court explained that the First Amendment does not require an inquiry into whether a statement is an opinion or fact, because "the existing constitutional doctrine adequately secures freedom of expression without the need to create an artificial dichotomy between the two." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex.App– Tyler, 2008, pet. denied) (citing *Milkovich*, 497 U.S. at 119, 110 S.Ct. at 2695). However, in its motion to dismiss, Plaintiff relies on older Texas law which predicates a defamation claimant's ability to recover on whether the speech in question was an opinion or fact. (*See* Motion at 9) (citing *Einhorn v. LaChance*, 823 S.W.2d 405, 410-11 (Tex.App–Houston [1ˢᵗ Dist.] 1992, writ dism'd w.o.j.).

257 S.W.3d at 509 (citing *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705-06. Indeed, Moore's uncertainty as to whether Wright had violated the Employment Agreement does not detract from the gravity of the assertion that he believed that Wright had done so. The gist of Moore's remarks show his belief that Wright had taken advantage of his employment relationship with Polyflow. On this record, the allegedly defamatory statements include or imply verifiable facts, including Defendants' professional behavior and integrity. *Ridha v. Texas A & M University System*, No. 4:08-cv-2814, 2009 WL 1406355, at *7 (S.D. Tex. May 15, 2009). Accepting Defendants' allegations as true, they have stated a narrow claim for defamation against Polyflow.

### *Defamation Per Se*

Defendants also allege that Plaintiff's comments are defamatory per se, so they need not prove any damages resulted from them. (*Id*. ¶ 67). A statement is defamatory per se if "it is so obviously harmful that general damages may be presumed." *In re Lipsky*, 460 S.W.3d at 596 (citing *Hancock v. Variyam*, 400 S.W.3d 59, 63-64 (Tex. 2014). General damages may include non-economic loss, such as loss of reputation and mental anguish. *Id.* Special damages, however, must always be proven in order for a recovery. *Hancock*, 400 S.W.3d at 66. Statements that have been previously held to be defamatory per se include accusations of criminal activity, infection with a loathsome disease, engaging in serious sexual misconduct, or incompetence in one's business or profession. *See Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex.App–Waco 2005, no pet.) (citing *Musser v. Smith Protective Serv., Inc*., 723 S.W.2d 653, 654-55 (Tex. 1987). Whether a statement qualifies as defamation per se is generally a question of law. *Hancock*, 400 S.W.3d at 66.

Defendants argue that Moore's remarks were defamatory per se, because they have caused obvious harm to their reputation. (Counterclaim ¶ 67). To recover for injury to their business reputation, Defendants must show that Moore's disparaging words have affected them in a manner that is particularly harmful to their specific business or profession, rather than merely harmful to

- 14 -

their general characteristics. *See In re Lipsky*, 460, S.W.3d at 596 (citing *Hancock*, 400 S.W.3d at 66-67). On this record, Wright has not pled sufficient facts to establish that Moore's statements, which purportedly falsely branded him as an intellectual property thief, have damaged his business of rehabilitating oil and gas wells and pipelines. (Amended Complaint ¶¶ 16, 17). Moore's accusations are not likely to adversely affect the perception of Wright's fitness as an oil field rehabilitation consultant. *Cf In re Lipsky* 460, S.W.3d at 596 (finding that allegation that natural gas producer was not environmentally responsible constituted defamation per se). Although Moore's remarks to Exxon may have been prejudicial to Defendants, on this record, they have not alleged facts sufficient to establish a claim for defamation per se.

### Business Disparagement

To state a claim for business disparagement, under Texas law, a claimant must establish that "(1) the [speaker] published false and disparaging information about [him], (2) with malice, (3) without privilege, (4) that resulted in special damages to the [claimant]." *In re Lipsky*, 460 S.W.3d at 592 (quoting *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). A defendant is liable for business disparagement "only if he knew of the falsity or acted with reckless disregard concerning [the falsity], or if he acted with ill will or intended to interfere in the economic interest of the [claimant] in an unprivileged fashion." *Forbes,* 124 S.W.3d at 170. Proof of special damages is another essential element of the business disparagement cause of action. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). To prove special damages, a claimant must show "pecuniary loss," which refers to "loss that has been realized or liquidated, as in the case of specific loss of sales." *Newsome v. Brod,* 89 S.W.3d 732, 734-35 (Tex.App-Houston [1st Dist.] 2002, no pet.). And, the defamatory communication must play a substantial role in causing others to cease dealing with the claimant, resulting in a reduction in trade, sales, or other matters. *Hurlbut,* 749 S.W.2d at 767.

As with the defamation claims, Defendants have failed to plead sufficient facts to show that Moore published disparaging information to the ASPC and Ambico Offshore. Publication is an essential element of a business disparagement claim, and it must be pled to avoid dismissal. *Desperado*, 2010 WL 2757523, at *3. Further, Defendants have not alleged any lost sales or other dealings as a result of Moore's comments to the ASPC or Ambico Offshore. They have stated only that they "expect to discover proof of additional lost business representing special damages through [] discovery." (*Id*. ¶ 61). However, any pecuniary loss resulting from business disparagement must be "immediate[ly] realizat[ed]" to satisfy the special damages element of the tort. *Teel v. Deloitte & Touche LLP*, No. 3:15-cv-2593-G, 2015 WL 9478187, at *6 (N.D. Tex. Dec. 29, 2015). For that reason, any claims for business disparagement based on Plaintiff's allegations to the ASPC and Ambico Offshore are dismissed.

But, Defendants also allege that, as a result of Moore's derogatory statements to Watts, Exxon "[ended] its business relationship with [] Specialty RTP" in December, 2015. (Counterclaim ¶¶ 40, 61). On this point, they claim that Moore's comments caused Exxon to award a rehabilitation contract to Polyflow, instead of to Specialty RTP, so they lost approximately $1.44 million in profits as a result of that lost contract. (*Id*.). Here, Defendants' pleadings adequately "identify a [] specific source of economic loss" that they suffered as a direct result of Plaintiff's allegedly defamatory speech. *Barrash v. American Ass'n of Neurological Surgeons, Inc*., No. 2013 WL 4401429, at* 4 (S.D. Tex. Aug. 13, 2013); *but see Encompass Office Solutions, Inc. v. Ingenix, Inc*., 775 F.Supp.2d 938, 959 (E.D. Tex. 2011) (dismissing business disparagement claim because pleadings were silent on any facts to support the special damages element of the claim). On this record, Defendants have stated a valid claim for business disparagement that is based on Moore's comments to Exxon.

### Tortious Interference with an Existing Contract

To establish a claim of tortious interference with an existing contract, a plaintiff must show

"(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008). A contract is the foundational element of this cause of action. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 674 (S.D. Tex. 2010) (citing *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 140) (Tex.App.–Waco 2005, pet. denied). A claimant must then allege that the defendant "knowingly induced one of contracting parties to breach its contract obligations[,]" and that a contract provision was, in fact, breached. *Id.* General allegations of "interference with a business relationship" are insufficient to establish a claim for tortious interference with a contract. *Id.* (citing *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W. 3d 250, 265 (Tex.App–Corpus Christi 2006, pet. denied).

In this case, Defendants have failed to allege facts sufficient to support an inference that Plaintiff is liable for tortious interference with an existing contract. Defendants allege that Plaintiff's interfered with the Exxon Alabama Contract when it refused to supply Defendants' piping, after explicitly agreeing to do so. (Counterclaim ¶ 72). However, Defendants do not allege that Polyflow "took an active part in persuading a [contracting] party [] to breach [the contract]. (Motion at 11) (quoting *Amigo Broad.*, 521 F.3d at 493). Indeed, Defendants have not pled any facts to show that Polyflow's conduct caused non-performance on the part of Specialty RTP, or Exxon. Instead, Defendants contend only that they were forced to undertake additional work, and expense to locate another manufacturer of piping. (Counterclaim ¶ 29, Motion at 12). For these reasons, Defendants' claim for tortious interference with an existing contract is dismissed.

### *Tortious Interference with Prospective Business Relations*

To maintain an action for tortious interference with prospective business relations, a claimant

must establish that: "(1) there was a reasonable probability that the [claimant] would have entered into a contract; (2) the defendant committed an intentional act, with the purpose of harming the [claimant]; and (3) actual harm or damage resulted from the defendant's interference, i.e. that the defendant's actions prevented the relationship from occurring." *Rimkus*, 688 F.Supp.2d at 675. In addition, a claimant must allege that the defendant's conduct is independently tortious or wrongful, meaning that it would be actionable under a recognized tort. *Wal-Mart Stores, Inv. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). With regard to damages, a claimant must, "at minimum, [allege] that the tortious conduct constitutes a cause in fact that prevented the prospective business relationship from coming to fruition in the form of a contractual agreement. The test for cause in fact [] is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex.App.–Dallas 2004, pet. filed) (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

Here, Defendants contend that Moore's defamatory and disparaging remarks to Exxon were independently tortious acts. (Counterclaim ¶¶ 70, 72). Defendants also insist that Moore intentionally sought to subvert Exxon's relationship with Specialty RTP, and that his statements caused Exxon to award a $1.44 million contract to Polyflow, instead of to it. (*Id*. ¶¶ 40, 74). Defendants maintain that they would have had additional business dealings with Exxon, but for Moore's prejudicial statements. (*Id*. ¶ 73).

In response, Plaintiff contends that Defendants' have not adequately pled a foundational tort, because they have not stated a claim for defamation or business disparagement. (Motion at 12). However, as found previously, Defendants have alleged facts sufficient to support claims for defamation and business disparagement, based on Moore's remarks to Exxon. In addition, Defendants have also alleged that Exxon awarded a lucrative contract to Polyflow, instead of to

Specialty RTP, because of those remarks. On this record, Defendant's claim for tortious interference with prospective business relations contains sufficient factual specificity to survive Plaintiff's motion to dismiss. *Rimkus*, 688 F.Supp.2d at 676 (holding that evidence showing that defendant's actions prevented plaintiff from entering into a business relationship with a client, who instead did business with defendant, is proof of tortious interference of business relations). This claim remains.

### *Unfair Competition*

Under Texas law, "unfair competition is the umbrella for all statutory and non-statutory causes of action arising out of business conduct that is contrary to honest practice in industrial or commercial matters." *Engenium Solutions, Inc. v. Symphonic Technologies, Inc*., 924 F.Supp.2d 757, 791 (S.D. Tex. 2013) (internal quotations omitted). To establish a claim for unfair competition, a claimant must show an illegal act by the defendant which interfered with the claimant's ability to conduct its business. *Taylor Pub. Co. v. Jostens. Inc*., 216 F.3d 465, 486 (5th Cir. 2000). Although the illegal act need not violate criminal law, it must at least be an independent tort. *Id.* "'Thus, unfair competition functions like a piggy-back tort, applying only when the court finds that a related, independent tort has been committed.'" *DP Wagner Mfg. Inc. v. Pro Patch Systems, Inc.*, 434 F.Supp.2d 445, 462 (S.D. Tex. 2006) (quoting *Healthpoint, Ltd. v. River's Edge Pharms., LLC*, No. SA-03-cv-984-RF, 2005 WL 356839, at *3 (W.D. Tex. Feb. 14, 2005).

Plaintiff argues, first, that Defendants' claim for unfair competition fails as a matter of law, because there is no underlying tort liability. (Motion at 13). However, Plaintiff's argument is misplaced, because Defendants have stated claims for defamation, business disparagement, and tortious interference with prospective business relations. *Rimkus*, 688 F.Supp.2d at 676. Plaintiff also contends that Defendants' claim for unfair competition fails, because "it [is] merely duplicative of the claim for the underlying tort." (Motion at 14). It is well established, however, that unfair competition is a derivative tort. *Rimkus*, 688 F.Supp.2d at 676 (citing *Taylor Pub. Co. v. Jostens.*

*Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). A court may impose liability in a cause of action for unfair competition, only if the claimant has lodged an allegation of an independent tort, or other illegal conduct. *Baisden v. I'm Ready Productions, Inc.*, 2008 WL 2118170, at *8 (S.D. Tex. May 16, 2008) ("[]Texas courts have instructed that without some allegation of an independent substantive tort or other illegal conduct, liability cannot be premised on the tort of unfair competition."). In this case, Defendants allege that Plaintiff has engaged in unfair competition "by virtue of the business disparagement, defamation, and tortious interference with [] prospective business relations described" in their counterclaim. (Counterclaim ¶ 80). As such, Defendants have adequately stated a claim for unfair competition.

In sum, all of Defendants' claims for defamation per se fail, because they have not shown that Moore's disparaging remarks were particularly harmful to their specific business or profession. Defendants' claims for defamation and business disparagement which are premised on the statements to the ASPC and Ambico Offshore are barred by the Texas Defamation Mitigation Act. But, even had Defendants complied with the statute's conciliation provision, those claims would fail, because they have not alleged sufficient facts concerning the circumstances under which those comments were published.  Defendants have likewise failed to plead any special damages that were allegedly caused by Moore's remarks to the ASPC and Ambico Offshore. Defendants' claim for tortious interference with existing contracts is dismissed, because they have not shown that Plaintiff's conduct caused any contracting party to breach an existing contract. Defendants' remaining claims, then, are for defamation and business disparagement, based on Moore's statements to Exxon, as well as for tortious interference with prospective business relations, breach of contract, and unfair competition.

**Conclusion**

Accordingly, it is **ORDERED** that Plaintiff's motion to dismiss is **GRANTED**, in part, and **DENIED**, in part.

SIGNED at Houston, Texas, this 30th day of November, 2016.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**